IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JUAN VANEGAS,                                    *
                                                 *
        Plaintiff,                               *        Civil No. JFM 07-52
                                                 *
        v.                                       *
                                                 *
BOARD OF THE TRUSTEES OF THE                     *
HEALTH AND WELFARE FUND                          *
FOR THE INTERNATIONAL UNION                      *
OF OPERATING ENGINEERS,                          *
LOCAL 99 AND 99A,                                *
                                                 *
        and                                      *
                                                 *
GROUP HOSPITALIZATION AND                        *
MEDICAL SERVICES, INC.                           *
T/A CAREFIRST BLUECROSS                          *
BLUESHIELD                                       *
                                                 *
        Defendants.                              *
                                              *****

## OPINION

Plaintiff Juan Vanegas has brought suit under the Employee Retirement Income Security

Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*  Pursuant to his rights under 29 U.S.C. §

1132, plaintiff challenges the denial of medical benefits by defendants Board of Trustees of the

Health and Welfare Fund for the International Union of Operating Engineers Local 99 and 99A

(the "Fund") and Group Hospitalization and Medical Services, Inc. t/a Carefirst BlueCross

BlueShield ("CareFirst").  Specifically, plaintiff alleges that the Fund abused its discretion in

denying plaintiff's claims under one of its exclusions from coverage, entitled "Injuries While

Employed for Profit."  (Compl. ¶¶ 10, 13.)  Plaintiff asserts in the alternative that if I conclude

the Fund did not abuse its discretion, plaintiff is entitled to benefits under CareFirst's group

health care contract.  (*Id.* ¶ 14.)  Plaintiff and defendants have filed cross-motions for summary

judgment.  For the reasons detailed below, I grant the Fund's motion for summary judgment and

deny plaintiff's and CareFirst's motions for summary judgment.

## I.

The undisputed facts are as follows.  In December 1986, plaintiff sustained severe burn

injuries to his face and right eye while working in a plastics factory in California.  (*Id.* ¶ 7.)  As a

result, he required multiple reconstructive surgeries and grafts on his eyelid, lip, cheek, and nose.

(*Id.*)  Plaintiff did not receive workers' compensation benefits for his work-related injuries

because plaintiff's employer at the time did not have workers' compensation insurance.  (*Id.*)

Other than the reconstructive surgeries at the time of the accident and immediate post-operative

care, plaintiff required no ongoing or follow up medical treatment for his burn injuries until

2004.  (*Id.* ¶ 8; Pl.'s Mot. for Summ. J. at 2-3.)  In 2004, plaintiff sought medical treatment

because he was having difficulty shutting his right eye, the eye that was injured in the factory

accident.  Plaintiff also experienced recurring infections in the area of his nose, where skin grafts

had been implanted after the accident.  (Pl.'s Mot. for Summ. J. at 3.)  The treatment of

plaintiff's eyelid and nose problems since 2004 has required a series of reconstructive surgeries.

(*Id.*)

Plaintiff submitted insurance claims for these surgeries from 2004 through 2006 to

defendant CareFirst, which is a non-profit corporation that administers group benefit plans in

Maryland, the District of Columbia, and Virginia.  (CareFirst's Cross-Mot. for Summ. J. at 1-2.)

Plaintiff's wife's employer, Blue Ridge Partners Management Consulting, LLC, is a party to one

such group benefit plan ("the Blue Ridge Plan").  (*Id.* at 1.)  Plaintiff was eligible for benefits

under the Blue Ridge Plan as a dependent.  (*Id.* at 2; Pl.'s Mot. for Summ. J. at 3.)  CareFirst

timely paid these claims according to the terms and conditions of the Blue Ridge Plan until July

2006, when it learned that plaintiff was a subscriber of the Fund's group health care plan ("the

Local 99 Plan").[1]  (*Id.*)  After learning this, CareFirst rescinded all payments that it had made to

plaintiff's health care providers pursuant to the "coordination of benefits" provision in the Blue

Ridge Plan.[2]  (Pl.'s Mot. for Summ. J., Ex. B.)

 Upon being notified that prior payment of his claims under his wife's CareFirst policy

had been withdrawn, plaintiff submitted certain CareFirst Explanations of Benefits to the Local

99 Plan on July 13, 2006.  (Fund's Mem. in Supp. of Cross-Mot. for Summ. J. at 2, 5.)  A claims

processor employed by the Fund's contract administrator spoke with plaintiff and recorded in her

Electronic File Notes on July 13: "Per mbr, inj @ wk 12/86 in CA. W/C pd for initial inj to eye,

nose, lip, skin grafts frm other parts of his body used.  Yrs later he started having problems.  At

present problem clos'g eye, will nd surg . . . adv mbr, clms over 1 yr old will be denied & he will

have to appeal, I'll send him instructions." (*Id.* at 5; *id.*, Ex. 5.)  On August 7, 2006, the claims

processor notified plaintiff of his appeal procedure and requested that he provide her with (1)

itemized bills to match the CareFirst Explanation of Benefits, (2) a Completed Subrogation

Agreement, (3) workman's compensation conditions of payment regarding the initial injury and

_____

[1] Plaintiff had been a subscriber of the Local 99 Plan since July 2000, when he joined the Operating Engineers Local 99 and 99A Union as an employee of Consolidated Engineering Services.  (Fund's Opp. to Pl.'s Mot. for Summ. J. at 2; Mem. in Supp. of CareFirst's Cross-Mot. for Summ. J. at 2.)

[2] The "coordination of benefits" provision reads: "If the Member is covered under one Health Plan as a subscriber and under the other Health Plan as a dependent, the Health Plan which covers the Member as a subscriber is the Primary Health Plan."  (Mem. in Supp. of CareFirst's Cross-Mot. for Summ. J. at 2.)  The Blue Ridge Plan states further: "If we are the Secondary Health Plan, we will reduce Allowable Expenses toward which benefits may be applied to the extent that payment for those Allowable Expenses is the responsibility of the Primary Health Plan. In no event will the total benefits we provide exceed the total benefits that we would have provided if we were the Primary Health Plan."  (*Id.* at 5.)

subsequent health issues, and (4) a letter of appeal to the Fund's Board of Trustees.  (*Id.* at 2; *id.*, Ex. 1.)  On August 11, the claims processor noted: "P.c. frm wife, 1996, when in @ work, co not covered w/ WC.  He signed off releasing owner of com at some point, no longer has papers with attorney's office or name of attorney."  (*Id.* at 5; *id.*, Ex. 5.)

On August 24, 2006, plaintiff submitted to the Local 99 Plan an appeal letter, in which he requested that treatment he received from 2004 through 2006, for which CareFirst had withdrawn payment, should be covered under the Local 99 Plan.  (Pl.'s Mot. for Summ. J., Ex. A; Fund's Mem. in Supp. of Cross-Mot. for Summ. J., Ex. 2.)  In his letter, plaintiff described the events surrounding his original injury in 1986; explained that treatment for his original injury had not been covered by workmen's compensation; detailed the treatment and surgeries needed on his right eye over the last few years; and requested the Fund to "pay all claims back to 2004 that CareFirst (my wife's policy) has rejected/reclaimed payment on."  (*Id.*)  Attached to plaintiff's appeal was a report from Todd Goodglick, M.D., dated July 16, 2005.  (Fund's Mem. in Supp. of Cross-Mot. for Summ. J., Ex. 2.)  Dr. Goodglick stated: "My impression is that Mr. Vanegas has lagophthalmos due to right lower lid retraction *as a result of his facial trauma and subsequent surgical procedures*."  (*Id.* (emphasis added).)

The Fund's Board of Trustees considered plaintiff's appeal at their quarterly meeting held on September 13, 2006.  (*See id.*, Ex. 6.)  It denied coverage of plaintiff's claims on the grounds that plaintiff's injury and treatment fell under the work-related injuries exclusion of the Local 99 Plan.[3]  (*Id.* at 3.)  The Fund's Board of Trustees explained in its September 14, 2006

---

[3] Defendant Fund asserts that it denied plaintiff's medical claims for a variety of reasons, including some claims that allegedly were not timely filed, and some claims that allegedly could not be processed to completion because plaintiff failed to provide required documentation.  (Fund's Opp. to Pl.'s Mot. for Summ. J. at 2-4.)  Both plaintiff and the Fund agree, however, that the only claims at issue in this litigation are those that were denied under

letter:

> The Local 99 Board of Trustees held their quarterly Board meeting on September 13, 2006.  Your request for coverage of services related to your work injury in December of 1986 was submitted for consideration at that time.
>
> I regret to inform you the Board denied your request for coverage.  The denial was based on the Plan's exclusion detailed on page 33 (U) [sic] whereas any injury which occurred while employed or engaged in any activity for profit would not be covered.
>
> The Trustees recommend employing legal representation to pursue recovery through uninsured funds.
>
> The Local 99 Health Plan will provide coverage for standard health expenses not related to your injury of 1986.

(Pl.'s Mot. for Summ. J., Ex. D.)

Specifically, the Fund's Board of Trustees based its denial[4] on Article VII, Section 7.01(V) of the Local 99 Plan, which states: "Exclusions from Coverage . . . [T]he Plan will not pay or reimburse charges for the following treatment (including, but not limited to, examinations, hospitalizations, services, supplies and surgery) or under the conditions outlined below: . . . (V) Injuries While Employed For Profit.  Services or treatment in connection with injuries sustained while doing any act or thing pertaining to any occupation or employment for compensation or profit."  (Pl.'s Mot. for Summ. J., Ex. E.)


## II.

Plaintiff and both defendants (the Fund and CareFirst) have filed cross-motions for

---

the Local 99 Plan exclusion for work related injuries: Article VII, Section 7.01 (V).  (*See* Pl.'s Mem. in Opp. to Fund's Mot. for Summ. J. at 2; Fund's Reply to Pl.'s Opp. to Fund's Mot. for Summ. J. at 4.)

[4] According to plaintiff, Fund has denied sixteen (16) medical claims reflecting total charges of $22,236.49 under the Section 7.01 (V) exclusion.  (Pl.'s Mem. in Opp. to Fund's Mot. for Summ. J. at 2; Pl.'s Mot. for Summ. J., Ex. F).  Defendant Fund provides slightly different figures, asserting that it has denied eighteen (18) claims reflecting total charges of $33,258.49 under Section 7.01(V) of the Local 99 Plan.  (Fund's Opp. to Pl.'s Mot. for Summ. J. at 4.)

summary judgment.  A motion for summary judgment should be granted when the record

establishes that there is no genuine issue of material fact, and the moving party is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).  The substantive law of the cause of action determines which facts are material.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  The existence of other factual

disputes between the litigants does not defeat an otherwise proper motion for summary judgment

if none of the material facts are in dispute.  *Id*.  A dispute about a material fact is genuine and

summary judgment is inappropriate if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party.  *Id.*  In analyzing whether a genuine issue of material fact

exists, the evidence and reasonable inferences from that evidence must be viewed in the light

most favorable to the nonmoving party.  *Id*. at 255.

Both the Fund's Local 99 Plan and CareFirst's Blue Ridge Plan are governed by ERISA.

*See* 29 U.S.C. § 1003.  Under section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), "[a]

civil action may be brought by a participant or beneficiary to recover benefits due to him under

the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to

future benefits under the terms of the plan."  In reviewing a plan administrator's decision to deny

benefits, the court must first determine whether the plan gives the administrator discretionary

authority to construe uncertain terms and determine eligibility for benefits.  *Booth v. Wal-Mart

Stores, Inc.*, 201 F.3d 335, 340-41 (4th Cir. 2000); *Firestone Tire & Rubber Co. V. Bruch*, 489

U.S. 101, 115 (1989).  If the plan does not give discretionary authority, the court reviews the

employee's claim *de novo* as it would any other contract claim - by looking to the terms of the

plan and other manifestations of the parties' intent.  *Booth*, 201 F.3d at 341; *Firestone*, 489 U.S.

at 112-13.  If, on the other hand, the plan by its terms confers discretion on the administrator, the court reviews the administrator's decision for abuse of discretion.  *Booth*, 201 F.3d at 341; *Firestone*, 489 U.S. at 111.

In the instant case, the Local 99 Plan gives its plan administrator discretion to determine the eligibility to receive medical benefits and to construe the terms of the Plan.[5]  CareFirst similarly asserts that the Blue Ridge Plan grants its administrator discretionary authority. (CareFirst's Cross-Mot. for Summ. J. at 3).  Plaintiff agrees that the Fund has discretionary authority, (Pl.'s Mot. for Summ. J. at 7), and does not dispute CareFirst's assertion. Accordingly, the standard of review here is abuse of discretion.

In determining whether there was an abuse of discretion, the court asks whether the denial of benefits was reasonable based on the facts known to the administrator at the time.  *Stup v. UNUM Life Ins. Co. of America*, 390 F.3d 301, 307 (4th Cir. 2004) (internal citations omitted). An administrator's decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence."  *Id.* (citing *Bernstein v. Capital-Care, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995) (internal quotation marks and citation omitted).)  The administrator's discretionary decision will not be disturbed if reasonable, even if the court itself would have reached a different conclusion.  *Booth*, 201 F.3d at 341; *Firestone*, 489 U.S. at 111; *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1185-86 (4th Cir. 1989).

---

[5] Article XI, Section 11.01(H) of the Local 99 Plan provides: "<u>Administrative Powers and Duties</u>.  The Trustees shall, in addition to the powers given them by law, have the following discretionary powers and duties, including the powers and duties to: . . . (H) Exercise discretion to construe the terms of the Plan and Trust to make all final determinations of eligibility, coverage and exclusion from coverage under the terms of the Plan . . ." (Fund's Mem. in Supp. of Cross-Mot. for Summ. J., Ex. 4.)  Article IV, Section 4.07 also states: " <u>Determination of Eligibility for Benefits</u>.  Should any disputes arise relative to the eligibility of an Employee or any Dependent for Benefits under the Plan, such disputes shall be resolved by the Trustees in their discretion."  (*Id.*)

The Fourth Circuit has set forth several factors that a court should consider when determining whether an ERISA trust fiduciary's exercise of discretion is reasonable.  *Booth* held:

> [A] court may consider, but is not limited to, such factors as: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth*, 201 F.3d at 342-43.

## III.

I will first consider whether the Fund abused its discretion in denying plaintiff benefits for his work-related injuries, and then turn to whether CareFirst abused its discretion in rescinding its payments of plaintiff's claims.

## A.

After applying the *Booth* factors to the instant case, I conclude that the Fund's Board of Trustees did not act unreasonably when it denied coverage to plaintiff based on the work-related injuries exclusion in the Local 99 Plan.  Plaintiff focuses on three *Booth* factors in arguing that the Fund abused its discretion by denying him medical benefits: the language of the plan; the purposes and goals of the plan; and whether the decisionmaking process was reasoned and principled.  (Pl.'s Mot. for Summ. J. at 9-18; Pl.'s Mem. in Opp. to Fund's Mot. for Summ. J. at 4-10.)   I will analyze each of these three *Booth* factors, and then address the remaining five in turn.

(1)

The crux of this dispute centers on the language of the Local 99 Plan's work-related injuries exclusion, Article VII, Section 7.01(V), which denies coverage for "[s]ervices or treatment in connection with injuries sustained while doing any act or thing pertaining to any occupation or employment for compensation or profit."  Plaintiff argues that the Fund unreasonably interpreted two terms in this exclusion: "in connection with" and "occupation or employment."[6]  (Pl.'s Mot. for Summ. J. at 9-18.)   Plaintiff argues that because "in connection with" is "ambiguous" and "[un]defined" in the Local 99 Plan, it should have been construed in favor of coverage.[7]  (Pl.'s Mot. for Summ. J. at 9-10.)  Plaintiff also argues that there was no "but for" or proximate causation between his original injury in 1986 and his treatment and surgeries from 2004 through 2006.  (*Id.* at 10.)  In that regard, plaintiff states that the Fund has given the term

the broadest possible interpretation, apparently having concluded that Plaintiff would not

---

[6] Plaintiff initially asserts that the Fund failed  to "liberally construe" the provisions of the Local 99 Plan for the benefit of Plan beneficiaries as required by ERISA case law and the Local 99 Plan itself.  (*Id.* at 9 (citing *Caffey v. UNUM Life Ins. Co.*, 302 F.3d 576, 580 (6th Cir. 2002) (holding that "ERISA places the burden of proving an exclusion from coverage in an ERISA-regulated welfare plan on the plan administrator"); Local 99 Plan Article XVI, Section 16.10 (providing that "[t]he provisions in this Plan and Trust Agreement shall be liberally construed in order to promote and effectuate the establishment and operation of the Benefit programs herein contemplated").)  Contrary to what plaintiff implies, however, neither *Caffey* nor the Local 99 Plan direct the Fund to construe provisions in favor of coverage if a reasonable interpretation results in the denial of coverage.

[7] Plaintiff relies on *Bynum v. CIGNA Healthcare of North Carolina, Inc.*, 287 F.3d 305, 313-14 (4th Cir. 2002), which held that when a term used in a plan is ambiguous, "that ambiguity is construed against the drafter of the plan, and it is construed in accordance with the reasonable expectations of the insured."  (*Id.* at 11-12.)  In *Bynum*, the Fourth Circuit held that the plan fiduciary acted unreasonably when it interpreted the previously undefined, ambiguous terms "cosmetic," "cosmetic services," and "cosmetic procedures" against the insured in denying insured's claim.  *Bynum*, 287 F.3d at 313-14.  *Bynum* is distinguishable for two reasons.  First, the *Bynum* court understandably held the word "cosmetic" to be ambiguous, a very different situation from "in connection with," which is not open to varying interpretations, particularly in light of *Pitner* (discussed *infra*).  Second, in *Bynum* the court found a conflict of interest, requiring it to give less deference to the administrator's decision.  *Bynum* , 287 F.3d at 311-12.  In the instant case, plaintiff does not allege a conflict of interest on the Fund's part, nor do I find any.

need further surgery to correct his eyelid and nose defects, "but for" the factory accident more than twenty years ago.  The Local 99 Plan administrator obviously can not argue, though, that either the factory accident or Plaintiff's acute burn injuries directly or proximately caused the impairment which affects Plaintiff's ability to shut his eye or which has caused recurring infections under the grafts in Plaintiff's nose.  These conditions developed many years after Vanegas had fully recovered from his acute burn injuries and the surgeries necessitated thereby.

(*Id.* at 10.)

Plaintiff asserts a "reasonable, but narrower" interpretation would limit "in connection with" to medical services rendered twenty years ago to treat plaintiff's original injuries.   (*Id.* at 11.)

Plaintiff's argument that "in connection with" is an ambiguous term is unpersuasive.   In *Pitner v. Health and Welfare Fund for the Int'l Union of Operating Eng'rs Local 99 and 99A*, No. Civ. A. AW-02-2385, 2004 WL 3178074 (D. Md. Jan. 21, 2004)*,* the court found no ambiguity in interpreting "in connection with" in a similar exclusion.[8]  *Pitner* held that the plan administrator had reasonably denied the plaintiff Pitner coverage because he had incurred treatment in connection with the injuries he sustained as result of his motorcycle accident while intoxicated.  *Id.* at *1-3.  *Pitner* found no ambiguity in the phrase "in connection with" because the plaintiff's treatment arose from the injuries caused by the accident.  *Id.* at *1.  Similarly in the instant case, "treatment in connection with injuries sustained while doing any act . . . pertaining to any . . . employment for compensation . . ." unambiguously requires a causal relationship between the injury and the treatment.

Where *Pitner* and the present case differ is in the length of time separating the injury and

---

[8] The provision excluded "[e]xaminations, hospitalization, services, supplies, surgery, and/or treatment incurred by a Participant or Dependant *in connection with* any injury resulting from the impairment or intoxication of such person from drugs or alcohol or resulting from the individual's being influenced by drugs or alcohol."  *Pitner*, 2004 WL 3178074, at *3 (emphasis added).

the treatment for which coverage was sought.  In *Pitner*, the treatment for which Pitner sought

coverage took place immediately after he sustained injuries in the motorcycle accident.  *Pitner,*

2004 WL 3178074, at *1.  In the present case, the treatment for which plaintiff seeks coverage

took place almost twenty years after he was injured in the 1986 factory accident.  For this reason,

plaintiff argues that there was no causal relationship or "connection" between the original injury

and the recent treatment.  (Pl.'s Mot. for Summ. J. at 10, 14.)

     This argument is unpersuasive, however, in light of the evidence that the Fund's Board of

Trustees considered in making its decision and relevant case law.  In determining whether

plaintiff's benefit claims were "in connection with" his original 1986 injury, the Fund's Board of

Trustees relied upon Dr. Goodglick's July 16, 2005 letter, which plaintiff included with his

August 24, 2006 appeal letter to the Fund.  (Fund's Opp. to Pl.'s Mot. for Summ. J. at 10.)   Dr.

Goodglick wrote: "My impression is that Mr. Vanegas has lagophthalmos due to his right lower

lid retraction *as a result of his facial trauma and subsequent surgical procedures* [twenty years

ago]." (Fund's Opp. to Pl.'s Mot. for Summ. J., Ex. 2 (emphasis added).)  Particularly because

this was the only medical opinion the Fund received from plaintiff, it was reasonable for it to

find a causal relationship between the recent treatment and the original injury.

     Recent case law supports the reasonableness of the Fund's interpretation.  In *Davidson v.*

*Wal-Mart Assocs. Health and Welfare Plan*, 305 F. Supp. 2d 1059, 1064-65 (S.D. Iowa 2004),

the court upheld a plan administrator's denial of coverage for breast reconstruction surgery

because the plaintiff had *twenty-two years earlier* had breast enlargement surgery not directly

related to treatment for existing cancer.  The Plan exclusion stated that "[b]enefits shall not be

payable for treatment or services [1] for . . . any expenses or charges resulting from breast

enlargement . . . unless directly related to treatment of existing cancer . . .[or] [2] [for] [c]harges for *complications arising from* any non-covered illness, injury, device or medical treatment." *Id.* at 1065 n.7 (emphasis added).  Similar to the instant case, the administrator reasonably found a causal connection between an event twenty years earlier and the current treatment for complications resulting or arising from that event.

    *Jackson v. Wal-Mart Stores, Inc. Assocs.' Health and Welfare Plan*, 92 F. Supp. 2d 882 (W.D. Ark. 2000), upon which plaintiff largely relies, is distinguishable.  There the court held that the administrator's denial of coverage under the worker's compensation and settlement exclusions[9] was unreasonable because "[t]here is simply *nothing in the record* that shows the broken screws [for which plaintiff sought coverage] were related to the automobile accident [covered by the worker's compensation settlement exclusion].  *Nor is there any evidence* that the [1998] surgery [for the broken screws] was the result of the worsening of a condition brought on by the automobile accident."  *Id.* at 890 (emphasis added).  In the instant case, by contrast, Dr. Goodglick provided strong evidentiary support in the record for the Fund's conclusion that plaintiff's recent treatments resulted from his original injury.  Accordingly, unlike in *Jackson*, it was reasonable for the Fund's Board of Trustees to conclude that the treatment for which plaintiff sought coverage was "in connection with" his 1986 injury.[10]

---

[9] The Plan in *Jackson* provided that benefits are not payable for treatment or services for [1] "charges for any medical services, medical supplies or medical treatments to the extent of the amount of any judgment, settlement and/or payment which was previously made on behalf of you . . . [or] [2] charges covered and/or paid under any Workers' Compensation law or act [or] charges for which you have received a work-related settlement . . ." *Jackson*, 92 F. Supp. 2d at 885.

[10] Plaintiff argues further that he has requested coverage "not for the treatment of a work related injury *per se*, but for a secondary medical condition that developed years after his work related injury."  (Pl.'s Mem. in Opp. to Fund' Mot. for Summ. J. at 4.)  Plaintiff submits that the Local 99 Plan's failure to specifically exclude coverage for complications and secondary medical conditions - but instead only for treatment or services in connection with "work related injuries" - "has created considerable ambiguity concerning the scope of the 'work related injuries'

Second, plaintiff argues that the Fund unreasonably gave the term "occupation or employment" in the work-related injuries exclusion an overly expansive definition that includes not only plaintiff's current employment, but also "any and all past employment." (Pl.'s Mot. for Summ. J. at 15.) Noting that the Local 99 Plan provides no definition of "employment," plaintiff contends that it should be limited to plaintiff's current employment for two reasons. First, plaintiff cites the Plan's definition of "Employee" (a member of Local 99 who works for an Employer) and "Employer" (one bound by the terms of the collective bargaining agreement with the Local 99 union) as support. (*Id.* at 15-16; *id.*, Ex. J, Article I - Definition of Terms, Section 1.01(16)-(17).) Second, plaintiff argues that the language of the Workmen's Compensation exclusion in the Local 99 Plan supports a narrower definition of "employment" in the work-related injuries exclusion. (Pl.'s Mot. for Summ. J. at 16 n.9.) Because the Workmen's Compensation exclusion (Pl.'s Mot. for Summ. J., Ex. E, Article VII, Section 7.01(TT)) explicitly defines employment as "employment . . . by the Employer, or by any other employer," plaintiff asserts that in not providing such detail in the work-related injuries exclusion, the drafters of the Plan thus intended a narrower definition. (*Id.* at 16.)

Plaintiff's textual arguments fail because he ignores the broad language of the work-related injuries exclusion itself. Article VII, Section 7.01(V) of the Local 99 Plan excludes treatment in connection with injuries "sustained while doing any act . . . pertaining to *any*

---

exclusion." (*Id.* at 6-7 (*see Fought v. UNUM Life Ins. Co. of America*, 379 F.3d 997, 1009-13 (10th Cir. 2004) (holding that the administrator acted unreasonably in denying coverage for the treatment of complications from plaintiff's surgery when the Plan excluded only coverage for pre-existing conditions).) Just as with *Davidson*, 305 F. Supp. 2d at 1064-65, discussed above, I conclude, however, that excluding "[s]ervices or treatment in connection with" work-related injuries is not functionally different than excluding "services or treatment in connection with *complications from*" work-related injuries. Under both, the administrator must determine whether there is a casual connection between the treatment for which the plaintiff seeks coverage and the original work-related injury.

occupation or employment for compensation . . ." (emphasis added).   The word "any" is

sufficiently broad to include any employment plaintiff might currently undertake, or any

employment that plaintiff might previously have undertaken.   The definitions of "Employer" and

"Employee" in the Local 99 Plan pertain only to which employers must contribute to the Plan,

and which employees are eligible to participate in the Plan.   (Pl.'s Mot. for Summ. J., Ex. J,

Article I, Section 1.01(16)-(17).)   Moreover, the Workmen's Compensation exclusion defines

employment for the purposes of that exclusion precisely because it does not include the broad

term "*any* occupation or employment."   (Pl.'s Mot. for Summ. J., Ex. E, Article VII, Section

7.01(TT).)   Accordingly, I cannot conclude that the Fund abused its discretion in defining

"employment" to include *any* employment that plaintiff has undertaken for compensation or

profit.

(2)

The second *Booth* factor is "the purposes and goals of the plan."   Plaintiff argues that the

purpose of Section 7.01(V) is to prevent an employee from "double-dipping" by recovering

benefits for injuries he sustains while working for Consolidated Engineering Services (plaintiff's

current employer) both under the Local 99 Plan and Consolidated Engineering Services'

worker's compensation insurance.   (Pl.'s Mot. for Summ. J. at 16-17.)   That cannot be the

purpose of Section 7.01(V), however, because that purpose is fully achieved by the worker's

compensation exclusion contained in Section 7.01(TT).[11]   Likewise, the purpose of Section

---

[11] Section 7.01(TT) excludes "Services for any condition, disease, or accident arising out of, or in the
course of a Participant's or Dependent's employment (whether by the Employer, or by any other employer) for
which benefits are payable to the Participant or Dependent under any workmen's compensation law or similar
legislation."   (Pl.'s Mot. for Summ. J., Ex. E.)

7.01(V) cannot be to prevent an employee who has been injured while working for another employer from double-dipping to recover benefits both under the Local 99 Plan and worker's compensation insurance provided by the other employer because that purpose too is fully achieved by Section 7.01(TT).

There is a third possible interpretation of Section 7.01(V) that would attribute to that section a purpose that would not be fulfilled by denying benefits to plaintiff in this case.  It might be that the section is intended only to prevent an employee of Consolidated Engineering Services from recovering benefits for injuries he sustains while "moonlighting," i.e. contemporaneously working for an employer other than Consolidated Engineering Services, even if the other employer does not provide worker's compensation benefits.  *See Vance v. Pilot Life Ins. Co.*, 831 F.2d 142 (6th Cir. 1987).  If that were the case, plaintiff should not be denied benefits because he was injured not while moonlighting but while employed years before by an employer who did not carry worker's compensation insurance.

Attributing this purpose to Section 7.01(V) would be consistent with the principle of construing provisions of a health care plan liberally in order to cover deserving applicants. The Fourth Circuit has cautioned, however, that analysis of the purposes and goals of a plan should not focus simply upon the equity of a particular claim but take into account all of the provisions of the plan as a whole.  Thus, the court has held that a fiduciary "must serve the best interests of all Plan beneficiaries, not just the best interest of one potential beneficiary."  *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 234 (4th Cir. 1997); *Pitner*, 2004 WL 3178074, at *3. Likewise, the court has ruled that a Plan administrator "has the obligation to guard the assets of the trust from improper claims, as well as the obligation to pay out legitimate claims."  *LeFebre*

*v. Westinghouse Elec. Corp.*, 575 F.2d 197, 207 (4th Cir. 1984).  Section 3.01 of the Local 99

Plan may be read as echoing these admonitions.  It describes the Plan's purpose as "providing

benefits to meet medical expenses, especially those arising from unexpected illness and injury,

for the maximum number of Participants, Dependants, and Beneficiaries."  (Fund's Opp. to Pl.'s

Mot. for Summ. J. at 7.)  If the Plan's Trustees were to pay claims not covered by the Plan, they

would not be able to provide coverage for the maximum number of persons who are entitled to

benefits under it.

Against this background I find the second *Booth* factor to be inconclusive.  In any event,

assuming that this factor weighs in favor of plaintiff, I further find that it is outweighed by the

other factors that *Booth* mandates I consider.

(3)

Finally, plaintiff argues that the Fund's decision-making process was not reasoned and

principled.  (Pl.'s Mem. in Opp. to Fund's Mot. for Summ. J. at 8.)  Plaintiff focuses its criticism

on the Fund's September 14, 2006 letter denying plaintiff's appeal for coverage.  Plaintiff asserts

that the denial letter "does not refer to the documents and materials, if any, which the trustees

considered or relied on" and "contains no definition of the term 'injuries' as used in the coverage

exclusion for 'work related injuries" and "no discussion of Plaintiff's medical diagnosis -

lagophthalmos - and the 'connection' between this diagnosis and the injuries which Vanegas

sustained 20 years ago."  (*Id.*)  Plaintiff is correct in arguing that the Fund's Board of Trustees

could have provided greater detail behind the reasons for its denial of benefits in its September

14, 2006 letter.  (*See* Pl.'s Mot. for Summ. J., Ex. D.)  In particular, the Fund could have stated

explicitly that it was relying on Dr. Goodglick's letter describing plaintiff's current treatment as

-16-

a "result" of his original 1986 injury in denying plaintiff's claims.

The fact that the Fund did not provide such detail, however, does not make its denial of coverage unreasonable. Plaintiff provides no authority that requires a detailed discussion of the documents on which the plan administrator relies or of the causal connection between the treatment for which coverage is sought and the original injury. Plaintiff analogizes the present case to *Vander Pas v. UNUM Life Ins. Co. of America*, 7 F. Supp. 2d 1011, 1018 (E.D. Wis. 1998), which held that the plan administrator acted arbitrarily and capriciously in determining that the insured's disability was caused by a pre-existing condition because the claim review offered "no reasoning, no proximate cause analysis, no extrinsic evidence, [and] no construction of ambiguous policy language." *Vander Pas* is clearly distinguishable from the present case. The Fund explicitly stated in its September 14, 2006 letter that plaintiff's "services related to [his] [1986] work injury" and that the denial was "based on" the work-related injuries exclusion. (Pl.'s Mot. for Summ. J., Ex. D.)

Furthermore, the Fund's decision-making process in reaching these conclusions was, in fact, reasoned and principled. The September 13, 2006 meeting considering plaintiff's appeal was attended both by Management Trustees and Labor Trustees. (Fund's Opp. to Pl.'s Mot. for Summ. J. at 8.) The Board of Trustees considered all of the evidence before it. Specifically, it considered plaintiff's August 24, 2006 letter, which explained that "[a] few years ago, through time and aging, my skin grafts [sic] [that I received as treatment for my 1986 injuries] started to get very tight." (Fund's Mem. in Supp. of Cross-Mot. for Summ. J., Ex. 2.) The Board considered Dr. Goodglick's letter that similarly described plaintiff's current medical problem - lagophthalmos - as a "result" of the facial trauma and subsequent surgeries plaintiff had

following his 1986 accident.  (*Id.*)  Furthermore, the Board was provided a comprehensive summary of plaintiff's appeal, (Fund's Mem. in Supp. of Cross-Mot. for Summ. J., Ex. 6), as well as the electronic file notes transcript of the Fund's claims processor's conversations with plaintiff and plaintiff's wife between June and October 2006.  (Fund's Mem. in Supp. of Cross-Mot. for Summ. J., Ex. 6.)  All of this evidence supported the Fund's conclusion in its September 14, 2006 letter that coverage for plaintiff's claims must be denied because they fell under the Local 99 Plan's work-related injuries exclusion.  In addition, there was no evidence available to the Fund that disputed this conclusion.

The Fourth Circuit's decision in *Booth* provides further support for the reasonableness of the Fund's decision-making process.  201 F.3d at 335.  Plaintiff Booth's coverage request for medical expenses from coronary angioplasty procedures was denied as a secondary condition or complication of a pre-existing condition.  *Id*. at 338.  Despite opinions from two physicians that Booth had not had the pre-existing condition necessitating the coronary angioplasty procedures, the Plan's administrative committee relied on the testimony of two other physicians finding the pre-existing condition in denying coverage.  *Id.* at 338-40.  The Fourth Circuit held that it was not an abuse of discretion for a plan fiduciary to deny benefits where conflicting medical reports were presented.  *Id.* at 345.  Furthermore, the court held that the administrative committee's decision-making process was reasoned and its decision supported by substantial evidence: the committee had sought numerous reviews by independent doctors and considered "all the records and letters submitted" by Booth and her doctors.  *Id.* at 344.  Finally, the court noted that although "the breadth of [the Plan's pre-existing condition provision] could well take unwary plan beneficiaries by surprise, it nonetheless is a valid contractual provision."  *Id.* at 345.

In the present case, the Fund similarly considered all of the evidence before it in reaching

its decision.  Unlike in *Booth*, the Fund was not even confronted with conflicting evidence; all

the evidence before the Fund supported that plaintiff's treatment for which he sought coverage

was a result of his 1986 injury.  For this reason also, no reviews by independent doctors were

necessary.  Finally, just as in *Booth*, although the work-related injuries exclusion is broad, it is a

valid contractual provision to which the Fund must adhere.  Accordingly, I find the Fund's

decision-making process was reasoned and principled.

(4)

Because plaintiff does not allege - and I do not find - that the Fund acted unreasonably as

to the remaining five *Booth* factors, I will address them together rather than in individual

subsections.

As to the adequacy of the materials considered to make the decision and the degree to

which they support it, the Fund's Board of Trustees considered all materials submitted by

plaintiff, including his August 24, 2006 appeal letter, the letter from Dr. Goodglick dated July

16, 2005, internal records of telephone discussions with plaintiff and his wife, and every other

document submitted by plaintiff.  Plaintiff does not argue that there was additional evidence that

the Fund did not consider.[12]

---

[12] The only disagreement between plaintiff and the Fund is whether this court may consider evidence that was not before the plan administrator when it made its decision.  Specifically, the issue is whether the affidavits of Sandra Dickerson and James Peterson - which the Fund submitted as attachments to its Opposition to Plaintiff's Motion for Summary Judgment and its Memorandum in Support of its Cross-Motion for Summary Judgment, respectively - may be considered by this court.  The Fund argues that the court may consider the affidavits because they are "a necessary amendment or modification of the [Designated Administrative Record, entitled 'Electronic Summary of Claims'], and as such is properly admissible under the specific language of the Electronic Summary providing for future amendment and modification."  (Fund's Reply to Pl.'s Opp. to Fund's Mot. for Summ. J. at 2-3.)  However, the Fund provides no authority supporting such an exception.  The Fourth Circuit has held that a court may only consider evidence included in the administrative record when determining whether an ERISA fiduciary has

As to whether the decision was consistent with the procedural and substantive requirements of ERISA, the Fourth Circuit has construed the federal regulations (29 C.F.R. § 2560.503-1(g)(1)) to require Plans to, at a minimum: (1) provide the claimant the opportunity to submit a written application requesting a review; (2) allow the claimant the opportunity to review relevant documents; and (3) permit the claimant to propose comments and concerns in writing. *Ellis*, 126 F.3d at 236. All of these conditions were met, and plaintiff does not argue otherwise.

As to the remaining three factors - whether the fiduciary's interpretation was consistent with other provisions in the Plan and with earlier interpretations of the Plan; any external standard relevant to the exercise of discretion; the fiduciary's motives and any conflict of interest it may have - plaintiff has not alleged wrongdoing. Moreover, I find no inconsistency with earlier interpretations, no relevant external standards, and no conflict of interest.

## B.

As to CareFirst's decision to deny benefits to plaintiff, plaintiff argues in the alternative that if this court determines that plaintiff is not entitled to benefits under the Local 99 Plan, then plaintiff is entitled to benefits under CareFirst's Blue Ridge Plan. (Pl.'s Mot. for Summ. J. at 18.) Plaintiff asserts that if it is not entitled to coverage under the Local 99 Plan, "then it must be concluded that CareFirst erroneously determined that Plaintiff's Local 99 Plan coverage for this medical treatment was primary. If the Local 99 Plan is not primarily obligated to pay for Plaintiff's medical treatment, then necessarily CareFirst is primarily obligated to pay, and should

---

abused its discretion. *See Stup*, 390 F.3d at 307 n.3; *Booth*, 201 F.3d at 339 n.1. Accordingly, I have not considered these affidavits.

be directed to do so."  (*Id.* at 18-19.)

To the extent that plaintiff argues that the Local 99 Plan ceases to be the primary insurer (and the Blue Ridge Plan instead becomes the primary insurer) if plaintiff's claims fall under a Local 99 Plan exclusion, plaintiff's argument fails.  CareFirst reasonably determined that the Local 99 Plan is plaintiff's primary insurer.  *See Booth*, 201 F.3d at 341; *Firestone*, 489 U.S. at 111; *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1185-86 (4th Cir. 1989).  The Blue Ridge Plan "coordination of benefits" provision reads: "If the Member is covered under one Health Plan as a subscriber and under the other Health Plan as a dependent, the Health Plan which covers the Member as a subscriber is the Primary Health Plan."  (Mem. in Supp. of CareFirst's Cross-Mot. for Summ. J. at 2.)  Carefirst reasonably interpreted "which covers the Member as a subscriber" to mean the health plan that *generally* covers plaintiff as a subscriber (i.e. the Local 99 Plan), not the plan (if any) that provides coverage to the insured for the *specific claim* at issue.  Plaintiff does not dispute that he is a subscriber of the Local 99 Plan and a dependent of the Blue Ridge Plan.  (Pl.'s Mot. for Summ. J. at 3, 18.)  In addition, under the Blue Ridge Plan's definitions of "subscriber"[13] and "dependent,"[14] plaintiff is clearly not a subscriber of the Blue Ridge Plan.  Accordingly, it was reasonable for CareFirst to determine that the Local 99 Plan is plaintiff's primary insurer, and thus to rescind payment of plaintiff's claims and request that he submit his claims to the Local 99 Plan.

The fact that the Local 99 Plan is plaintiff's primary insurer does not, however,

---

[13] The Blue Ridge Plan defines "subscriber" as "a Member who is covered under this Certificate as an Eligible Employee, rather than as a Dependent."  (Mem. in Supp. of CareFirst's Cross-Mot. for Summ. J. at 4 n.2.)

[14] The Blue Ridge Plan defines "dependent" as "a Member who is covered under the Group Contract as the spouse or eligible child of a Subscriber."  (Mem. in Supp. of CareFirst's Cross-Mot. for Summ. J. at 4 n.3.)

necessarily relieve CareFirst of responsibility for covering plaintiff's claims.  The Blue Ridge

Plan provides: "If we are the Secondary Health Plan, we will reduce Allowable Expenses toward

which benefits may be applied *to the extent* that payment for those Allowable Expenses is the

*responsibility* of the Primary Health Plan.  In no event will the total benefits we provide exceed

the total benefits that we would have provided if we were the Primary Health Plan."  (Mem. in

Supp. of CareFirst's Cross-Mot. for Summ. J. at 5 (emphasis added).)  CareFirst explains that

"the purpose of 'secondary' coverage is to pay only when the 'primary' coverage *does not cover*

the full allowed benefit."  (*Id.* (emphasis added).)

These provisions leave open the question of whether CareFirst is required to cover

plaintiff's claims if his primary insurer, the Local 99 Plan, denies coverage because the claims

fall under a plan exclusion.  Citing the provisions above, CareFirst asserts that the Blue Ridge

Plan only provides coverage to the extent that the primary health plan does not provide the full

allowed benefit that CareFirst would have provided if it were the primary health plan.  CareFirst

provides the following example: "if the allowed benefit for a certain $10,000.00 surgical

procedure is $5,000.00 under Plaintiff's 'primary' plan, and the allowed benefit for the same

surgical procedure is $7,000.00 under his 'secondary' plan, then the administrator of his

'primary' plan would be responsible for paying the full $5,000.00, and the administrator of his

'secondary' plan would be responsible for the additional $2,000.00."  (Mem. in Supp. of

CareFirst's Cross-Mot. for Summ. J. at 5-6 n.4.)  This example begs the question of whether

CareFirst would cover all $7,000.00 of the allowed benefit for a surgical procedure if the

primary plan covered $0.00 (e.g. because the procedure fell under an exclusion in the primary

plan).

CareFirst anticipates this issue by contending that under the Blue Ridge Plan, CareFirst "excludes coverage for benefits that are or were available under worker's compensation or employer's liability law.  Thus, if this Court finds that the medical services that Plaintiff received resulted from a work-related injury, coverage for those services are excluded under the Blue Ridge Plan in any event."  (Mem. in Supp. of CareFirst's Cross-Mot. for Summ. J. at 6 n.5.)  To the extent that CareFirst is arguing that it is not responsible for covering plaintiff's claims because it has a policy of avoiding "duplicate payments"[15] with worker's compensation or work-related injury insurance, that argument is unpersuasive.  Plaintiff was not entitled to, nor did he receive, worker's compensation from his employer in 1986 or from his current employer.  None of plaintiff's claims for treatment and surgeries between 2004 and 2006 that were related to his 1986 factory injury have been covered.

On the other hand, to the extent that CareFirst is arguing that the Blue Ridge Plan contains a provision *specifically excluding* (1) claims for work-related injuries or (2) claims that have been excluded by the insured's primary health plan, the argument might have merit.  However, at present the record does not include the Blue Ridge Plan in its entirety, and I therefore cannot determine whether the Plan contains such an exclusion.

Accordingly, the Fund's motion for summary judgment is granted, and plaintiff's and CareFirst's motions for summary judgment are denied.  A separate order to that effect is being entered herewith.

---

[15] The Blue Ridge plan provides: "When you are covered by two or more Health Plans and receive a service that is covered by this Certificate and by another Health Plan, the benefits under the Certificate will be coordinated with the other Health Plan.  This prevents overpayment or duplicate payments for the same service."  (Mem. in Supp. of CareFirst's Cross-Mot. for Summ. J. at 6 n.6.)

Date:   <u>November 20, 2007</u>          <u>    /s/                          </u>

J. Frederick Motz

United States District Judge